IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

STEPHANIE MCKOY YARBROUGH,    )
             )
         CLAIMANT,       )
             )
v.                      )     CIVIL ACTION NO. 5:16-CV-1471-KOB
             )
             )
NANCY A. BERRYHILL,        )
ACTING COMMISSIONER OF    )
SOCIAL SECURITY,          )
             )
         RESPONDENT.    )
             )

MEMORANDUM OPINION

I. INTRODUCTION

On August 19, 2014, the claimant, Stepahnie McKoy Yarbrough, protectively applied for

disability and disability insurance benefits under Title II of the Social Security Act because of

back pain, hypertension, obesity, depression, and anxiety.[1]  The Commissioner denied the claims

on December 12, 2014 because of lack of evidence. The claimant timely requested a hearing

before an Administrative Law Judge, who held a hearing on December 15, 2015. (R. 100-06,

191-95, 260-68).

In a decision dated February 10, 2016, the ALJ found the claimant not disabled under

Title II. The claimant filed a timely request for a hearing before the Appeals Council on April 8,

2016 and submitted new evidence to it. The Appeals Council considered the new evidence but

---

[1]  The claimant also initially applied for supplemental security income under Title XVI but
withdrew that application at the ALJ hearing on December 15, 2015.  (R. 25).

denied the claimant's appeal because that evidence did not provide a basis for changing the ALJ's decision. Thus, the ALJ's decision became the final decision of the Commissioner on August 1, 2016. (R. 1-6, 25-38).

The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court REVERSES AND REMANDS the decision of the Commissioner because the Appeals Council failed to adequately evaluate the claimant's new evidence.

## II. ISSUE PRESENTED[2]

The issue before the court is whether the Appeals Council erred by failing to adequately evaluate the claimant's new, chronologically relevant, and material evidence.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the ALJ applied the correct legal standards and if substantial evidence supports her factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal claims." *Walker*, 826 F.2d at 999. This court does not review the ALJ's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

---

[2] The claimant presented other issues for review, but the court will not address those issues in full because it will reverse on the issue in this section. However, the court will express its concern regarding those issues at the end of its discussion section.

2

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity (RFC), and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets a Listing and is entitled to Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

The issue upon which the court will reverse the Commissioner's decision in this case involves evidence submitted by the claimant to the Appeals Council after the ALJ's decision. Generally, a claimant may present new evidence at each stage of the administrative process. *Washington v. Comm'r of Soc. Sec. Admin.*, 806 F.3d 1317, 1320 (11th Cir. 2015). The Appeals Council has the discretion to not review the ALJ's denial of benefits. *See* 20 C.F.R. §

416.1470(b). But, in making its decision whether to review the ALJ's decision, the Appeals Council "must consider new, material, and chronologically relevant evidence" that the claimant submits. *Hargress v. Soc. Sec. Admin.*, 874 F.3d 1284, 1290-91 (11th Cir. 2017); *Washington*, 806 F.3d at 1320.

Evidence is material if a reasonable possibility exists that it would change the administrative result. *Washington*, 806 F.3d at 1321. Evidence is chronologically relevant if "it relates to the period on or before the date of the [ALJ] hearing decision." *Hargress*, 874 F.3d at 1291. Medical opinions based on treatment occurring after the date of the ALJ's decision may still be chronologically relevant if the records upon which the doctor bases his opinion relate to the period on or before the date of the ALJ's decision. *See Washington*, 806 F.3d at 1323. The claimant can show that a medical opinion dated after the ALJ's decision is chronologically relevant if it is based on a "review of the claimant's medical history and [her] report of symptoms during the relevant time period and there was no evidence of a decline in [her] condition since the ALJ's decision." *Ashley v. Comm'r of Soc. Sec. Admin.*, 707 F. App'x 939, 944 (11th Cir. 2017) (citing *Washington*, 806 F.3d at 1322-23); *see also Hargress*, 874 F.3d at 1291 (discussing *Washington*, 806 F.3d at 1319, 1322-23).

This court has the authority to remand a case based on such new, material, and chronologically relevant evidence pursuant to 42 U.S.C. §405(g) under a sentence four remand or reversal. *See* 20 C.F.R. §§ 404.940, 404.946. "To obtain a sentence four remand, the claimant must show that, in light of the new evidence submitted to the Appeals Council, the ALJ's decision to deny benefits is not supported by substantial evidence in the record as a whole." *Hearn v. Soc. Sec. Admin.*, 619 F. App'x 892, 894 (11th Cir. 2015) (citing *Ingram v. Comm'r*

*Soc. Sec. Admin.*, 496 F.3d 1253, 1266-67 (11th Cir. 2007)). When the evidence submitted to the Appeals Council "undermine[s] the substantial evidence supporting the ALJ's decision," the Appeals Council errs in failing to review the ALJ's decision. *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 785 (11th Cir. 2014). "The Appeals Council must grant the petition for review if the ALJ's 'action, findings, or conclusion is contrary to the weight of the evidence,' including the new evidence." *Hargress*, 874 F.3d at 1291 (citing *Ingram*, 496 F.3d at 1261.

## V. FACTS

The claimant was fifty-one years of age at the time of the ALJ's final decision; had completed high school and two years of college; has past relevant work as a health care administrator and officer manager; and alleges disability based on back pain, hypertension, obesity, depression, and anxiety. (R. 192, 262).

### *Evidence of Physical and Mental Impairments in the Record Before the ALJ*

The claimant sought treatment on February 18, 2014 at Cullman Heart & Urgent Care for increased back pain that radiated to her leg for the past two days. She reported that sitting increased her pain. The claimant could walk heel to toe; had no balance issues; and reported no numbness. The nurse practitioner diagnosed sciatica and lumber radiculopathy and gave the claimant an injection of Toradol/Decadron for pain. The claimant returned for a follow-up on July 2, 2014 again complaining of increased low back pain for five days; the nurse practitioner gave the claimant another Toradol/Decadron injection for pain. (R. 393, 397).

On July 12, 2014, the claimant presented to American Family Care after hurting her back in a car accident the day before. The claimant complained of increased back pain as a result of the accident. Dr. Eileen Gallagher noted the claimant's prior prescriptions for Metformin,

Micardis, Nexium, and Prozac. Her blood pressure was 132/82, and she weighed 206.4 pounds. Dr. Gallagher assessed a back strain and back pain with sciatica; gave the claimant an injection of pain medications; and prescribed Percocet for five days after confirming "with the ADPH-PDH [that the claimant] had not receive[d] any pain medication in last 6 months—only listing is Alpraxolam fro[m] Dr. Corliss on 2/19/14."  (R. 301-02).

The claimant returned to Cullman Heart & Urgent Care on August 6, 2014, complaining of continued lower back pain radiating to her right leg that worsened since her July accident. The claimant's physical examination revealed tenderness to palpation in the lower lumbar area, and the doctor prescribed Narco and Ultram for pain.  (R. 391-92).

At the request of the Disability Determination Service, the claimant completed a "Function Report-Adult" on September 9, 2014.  In that report, the claimant noted that she had a laminectomy at L-5 and S-1 years ago that caused her inability to lift, and that her back pain has worsened since her car accident in July.  She stated that she was placed on medical leave in April 2012, and she resigned in May 2012 because she "wasn't healthy."

The claimant stated she lives with her husband and elderly mother, who she helps sometimes by bringing her water and calling for help when she falls.  The claimant's husband feeds the pets; helps her mother get up when she falls; and helps the claimant fill her "pill box." The claimant's typical day involves lying on a heating pad; doing back exercises and stretches; brushing teeth; taking a shower, but never a bath because sitting in the tub hurts her back; and reading and finding coupons in the paper.

She cannot sit for long durations because of her back pain and can walk about a half mile before she has to rest.  The claimant can dress herself except she needs help with her socks;

cannot shave her legs; and needs assistance using the toilet if her back pain is "irritated or strained." She can prepare simple meals like cheese toast, sandwiches, and frozen dinners, but can no longer cook like she used to because she cannot stand for long durations. She can sweep a "short time"; only does laundry "by piece at a time" because the clothes are too heavy to lift; does not go outside often; can drive only a short duration because of her back pain and sciatica; and shops in small stores for necessities.

The claimant stated she had a hysterectomy but could not take hormone replacements because of her rare blood disorder Factor Five Leiden. She became depressed in 2012 and had her Xanax increased three times because her depression worsened. She has no hobbies; has no church or social club affiliations; and no longer cares about how she looks. She has severe anxiety and wakes up sweating with a rapid heart rate; has severe focus and clarity issue; is unable to concentrate; never finishes anything at one time; and procrastinates. (R. 291-298).

The claimant's mother completed a "Function Report-Adult-Third Party, which was undated, that mirrored the limitations explained in the claimant's "Function Report." (R. 283-90).

After suffering increased back pain for four days, the claimant returned to Cullman Heart & Urgent Care on November 3, 2014. She described her back pain as constant that radiates to her right leg and said lying down helps decrease the pain. The doctor gave her another Toradol/Decadron injection for the pain. (R. 504-05).

On November 25, 2014, at the request of the Disability Determination Service, Dr. Jack L. Bentley, Jr. reviewed the claimant's medical records and conducted a consultative psychiatric examination of the claimant. The claimant told Dr. Bentley that she began experiencing

psychiatric issues in 2011 after a tornado nearly destroyed her home. She reported that she has "felt on the verge of a 'nervous breakdown' for the past three years"; has never had formal psychiatric treatment but has taken "multiple SSRIs [prescribed] by her PMD"; takes Prozac and Xanax that have done "little to alleviate the severity of her psychiatric difficulties"; and suffers from crying spells, severe depression, panic attacks, obsessive thinking, pacing, restlessness, and occasional periods of rage. Her teenage son also suffers from anxiety, and she worries about him. She told Dr. Bentley that she functioned for 27 years as an administrator for 15 different doctor groups, but could not handle the stress anymore and went on medical leave and then resigned in May 2014.

The claimant reported "moderate to severe sleep disturbance" because of her racing thoughts, obsessive thinking, and severe back pain. She can do "a variety of household chores," but has to rest frequently; rarely leaves home because she has to take care of her mother; has no hobbies; and does not socialize except with close family.

Dr. Bentley's physical examination of the claimant showed she weighed 204 pounds, which the claimant said was a gain of 40 pounds since May 2014. She was "severely depressed and cried profusely throughout the evaluation." Dr. Bentley noted evidence of the claimant's anxiety, restlessness, agitation and obsessional thinking during the interview. "She appeared on the verge of a panic attack" during the examination. She was alert and oriented; had normal attire and grooming; had normal psychomotor skills; could recall one of three objects after five minutes; could recite six digits forward and four backwards; spelled the word "world" backwards; could perform serial 7's and 3's from 100; correctly identified state and national

leaders; had little difficultly counting backwards from 20 to 1; and did not know the direction in which the sun rises.

Dr. Bentley's diagnostic impression was "MDD; GAD with a Panic Disorder; ADHD, by history; S&P Laminectomy; Obesity; Bilaterial Sciatica; Factor 5 with Hypertension." After finding "no evidence of symptom exaggeration," Dr. Bentley found that, based on his personal examination of the claimant and a review of her medical records, the claimant would have

> marked to severe limitations in her ability to sustain complex or repetitive work related activities. The severity of her psychiatric symptoms, chronic pain and inability to focus her attention span would disrupt her ability to perform these tasks in a timely manner. She could be expected to perform these tasks at a diminished pace. The [claimant] would have a moderate to marked limitation in her ability to even sustain simple work-related activities. Her lack of coping skills and previously described psychiatric difficulties would significantly limit her ability to perform these tasks in a timely manner. She is capable of communicating effectively with coworkers and supervisors.

(R. 412-15).

Dr. Justin Ross Hutto reviewed the claimant's medical records and conducted a consultative medical examination on November 29, 2014 at the request of the Disability Determination Service. The claimant explained to Dr. Hutto that her back pain began in 1995 when she sat in a "weird position" and "felt a pop in her lower back." She suffered severe back pain that radiated into her right hip and leg that resulted in a L4-5 laminectomy that same year. She indicated that her back pain has progressively worsened over the past years and has caused limitations in her ability to sit, stand, walk, and lift for any significant period of time. She also told Dr. Hutto about her anxiety, depression, and memory issues that have caused her to develop GI symptoms and incontinence.

Dr. Hutto noted that the claimant indicated she was laid off from her last job and is unemployed; she does not use an ambulatory device; has no trouble standing; cannot lift anything more than 5-10 pounds; can do simple household chores no more than 5 minutes; can climb stairs without difficulty; cannot take care of the yard or mow grass; and can balance a checkbook. He listed the claimant's current medications as Prozac, Maxalt as needed, Micardis HCTZ, Xanax, Lomotil as needed, Metformin as needed, Nexium, Robaxin as needed, and Advil as needed. He noted the claimant's blood pressure was 160/98 and her weight was 208 pounds.

Dr. Hutto's physical examination of the claimant showed she has a normal gait; no muscle spasms; ability to walk on heels and toes; ability to bend over and touch her toes; normal grip strength on both sides; normal motor strength in all extremities; intact sensation in upper and lower extremities; and normal reflexes. She had an abnormal straight leg test in the supine position on the right side; difficultly squatting; and decreased range of motion in her lumbar area. Dr. Hutto's impressions were that the claimant had moderate limitations in her lumbar range of motion and significant anxiety and depression symptoms that have "become severe enough to give her somatic symptom of bowel incontinence." Based on his physical examination and review of records, he assessed that the claimant can only lift and carry 5-10 pounds on a frequently basis on both sides. (R. 417-22).

The claimant returned to Cullman Heart & Urgent Care on December 2, 2014, complaining of right-sided back pain that had persisted for three days. The doctor prescribed Norco and Phenergan for pain. (R. 501-02).

On December 8, 2014, at the request of the Social Security Administration, Dr. Samuel Williams reviewed the claimant's records without physically examining her and completed a

"Mental Functional Capacity Assessment." Dr. Williams assessed that the claimant is *moderately* limited in her ability to understand and remember detailed instructions; to maintain concentration and attention for extended periods; to perform activities within a schedule, maintaining regular attendance, and be punctual; to work with others without distraction; to interact appropriately with the public; to accept instructions and constructive criticism from supervisors; and to respond to changes in the work setting. Dr. Williams specifically noted that the claimant "would likely miss 1-2 days [per] month due to psych symptoms." In all other areas of mental functioning, Dr. Williams found she was "not significantly limited." (R. 77-79).

The claimant began treatment with Dr. Henry S. Beeler on February 24, 2015. On that date, she complained of continued back pain, occasional migraines, anxiety, irritable bowel syndrome, and urinary incontinence. Dr. Beeler re-filled her Oxycodone, Micardis, and Limotil prescriptions. She returned to Dr. Beeler on March 25, 2015 for a follow-up and reported that her depression medications were working well, but she was having increased ADD symptoms and chronic back pain and fatigue. Dr. Beeler prescribed Adderall for the claimant's ADD and instructed her to increase the Adderall dosage from one to two pills daily if she felt no improvement in two weeks. He re-filled her prescription for Percocet. (R. 428).

She returned to the Cullman Heart & Urgent Care on April 10 and November 25, 2015, complaining of low back pain radiating down her leg after doing some lifting. Her blood pressure was 139/100 in April and 128/83 in December. The doctor gave her a Toradol/Decadron injection for the pain on both occasions. (R. 435, 499-500).

From June 11 to December 29, 2015, the claimant saw Dr. Beeler on approximately eight occasions: June 11; July 13; August 12: September 8; October 5; November 4; December 11;

and December 29.  During these visits, the claimant complained of increased anxiety because of the possible foreclosure of her home and her teenage son's anxiety; difficulty sleeping; increased difficulty focusing; and increased back pain.  On June 11, Dr. Beeler wrote a letter "To Whom It May Concern" stating, in his medical opinion, the claimant was "not physically or emotionally able to hold gainful employment."  At the June visit, Dr. Beeler increased her Zoloft dosage and prescribed Trazadone to help her sleep.  By July, Dr. Beeler changed the Trazadone prescription to Lunesta because the claimant continued to have difficulty sleeping; he increased the Lunesta and Adderall prescriptions in August because her symptoms were not improving. By the October 5 and November 4 appointments, Dr. Beeler increased her Lunesta and Adderall dosages again. Dr. Beeler's notes indicate that the claimant was taking Klonipin in November 2015 for her anxiety, but Dr. Beeler changed her prescription to Xanax in December because the Klonipin was not effective.  (R. 424, 429, 685)

On November 20, 2015, Nurse Practitioner Charlotte Michelle Cost wrote a letter "To whom it may concern," indicating that she treated the claimant for 9 ½ years and that she worked in the same office as the claimant during that time.  NP Cost noted that the claimant has chronic back pain that is "disabling" at times; had multiple epidural injections, steroid injections, and courses of pain medication management over the last fifteen years; and had physical therapy for her back pain as well.  NP Cost stated that the claimant's first back surgery resulted in a "large amount of scar tissue" that complicates her diagnosis and "creates the likelihood for an additional surgery."  She indicated that another surgery is not "an easy viable option" for the claimant because she has "Factor V Leiden clotting disorder" that increases the risks of surgery.

NP Cost also discussed in the letter the claimant's labile hypertension that increases with stress, anxiety, physical activity, and fatigue. She also noted that the claimant takes Metformin for a metabolic disorder; has a history of irritable bowel syndrome that causes severe diarrhea; suffers from ADD; has a history of migraines; and has bouts of depression.

In the letter, NP Cost assessed that the claimant could not lift more than 3 pounds without triggering muscle spasm and increased back pain and cannot sit for extended durations of more than 30 minutes. (R. 433-34).

At her December 29 appointment with Dr. Beeler, the claimant's blood pressure was high at 173/115; she weighed 210 pounds; and she was crying because of the denial of her social security application. (R. 686).

*ALJ Hearing*

At the ALJ hearing on December 15, 2015, the claimant testified that Dr. Brian Corliss placed her on medical leave from her last job on April 17, 2014, because of her "excruciating back pain [and] inability to focus." The ALJ asked the claimant about the lack of evidence in the record about Dr. Corliss placing her on medical leave, and the claimant stated "texts" from Dr. Corliss should be in medical file. The ALJ indicated that those texts without verification do not show a medical visit to Dr. Corliss. The claimant also stated that her employer called her in on May 9 and told her she "could either resign or be let go because [she] could no longer do her job." (R. 50-52).

The claimant testified that she was a health care administrator for 27 years and her medical treatment was "mainly informal" with the doctors with whom she worked. She would tell those doctors her symptoms and they called in medications for her but "they did not

document." She said the records her attorney submitted from the pharmacy would support this practice. The claimant pointed to a letter from NP Cost in the record that "summarizes her overall extensive medical history" and states that most of her medical treatment was "undocumented." The ALJ told the claimant that "it's still not documentation, but I'll put it in the file and I'll certainly give it the weight it's entitled to." (R. 55-58).

The claimant lives with her husband and her mother. The claimant's mother has cancer; home health care nurses help take care of her mother; and the claimant's sister-in-law takes her mother to the doctor. Her mom can prepare her own food and clean her own room. (R. 49-50).

Regarding her back pain, the claimant stated that she has seen Dr. Beeler and Dr. Coleman at Urgent Care for relief. Neither doctor has performed any current MRIs or x-rays of her back because "surgery is not an option for me at this time." Her car accident in July 2014 "worsened" her back. On a typical day, the claimant wakes up and does her back exercises, stretches, and takes a hot shower, but cannot take baths anymore because sitting hurts her back. (R. 50-52).

She has not been to vocational rehabilitation to find a job because she is "struggling significantly mentally." She has sought mental health treatment only with the physicians she works with and Dr. Beeler. She stated that she has not been to Mental Health of Cullman because Cullman is small town and she "would prefer to go out of town," but has not done so because of "financial reasons." Her insurance does not pay for mental health treatment because it is considered "non-allowable." She chooses to take her minor son who has mental health issues to mental health treatment and pays for his care; so she has no money left for herself. (R. 53-54).

The ALJ asked her if she has "tried to sell [her] house and move into a smaller house." The claimant stated that her house is still in foreclosure but Wells Fargo did a "loan modification" and her monthly payment actually increased because of home insurance and property taxes. (R. 54-55).

The vocational expert, Patsy Bramlett, listed the claimant's past relevant work as a health care administrator and an office manager, with both jobs classified as sedentary and unskilled. (R. 58). In his first hypothetical, the ALJ asked Ms. Bramlett to assume an individual of the claimant's age, education and past work experience who could perform work at the light exertional level with the following additional limitations: can perform occasional postural maneuvers; can never climb ropes, ladders, or scaffolds; must avoid hot or cold temperature extremes and unprotected heights; can understand, remember, and carry out simple instructions and tasks; has infrequent and well-explained workplace changes; needs non-intensive and infrequent interaction with the general public; and can concentrate and remain on task for two hours at a time sufficient to complete an eight-hour workday. Ms. Howell responded that the individual could work as an inspector, with 54,000 jobs available nationally; a packer or packager, with 62,000 jobs available nationally; and a hand bonder, with 104,000 jobs available nationally.[3] (R. 59-60).

In his second hypothetical, the ALJ asked Ms. Bramlett to assume all of the prior limitations and added that the hypothetical person needed the option to sit or stand during the workday one or two minutes every hour or so just to change position. Ms. Bramlett indicated that individual could perform the same jobs listed about and the number of jobs available would not change. (R. 60).

---

[3] Ms. Bramlett did not testify to the number of jobs available regionally or in Alabama.

The ALJ then asked Ms. Bramlett to assume all of the prior limitations and added that the individual would be limited to simple, routine, repetitive tasks not performed in a fast production environment. Ms. Bramlett responded that the three prior jobs that she listed for the first and second hypotheticals would be available in the same numbers. (R. 61).

In her last hypothetical, the ALJ asked Ms. Bramlett to assume all of the prior limitations but added that the individual would be expected to miss work two or more days per month on a consistent basis. Ms. Bramlett testified that no jobs would be available for that individual because employers for unskilled workers would not allow an employee to miss two or more days of work a month. Ms. Bramlett stated that missing one day a month is the maximum "you could miss and still retain the job." (R. 61-61).

*ALJ Decision*

The ALJ rendered an unfavorable decision to the claimant on February 10, 2016. The ALJ found that the claimant met the insured status requirements of the Social Security Act through December 31, 2018 and had not engaged in substantial gainful activity since April 17, 2014, the alleged onset date. (R.25-27).

The ALJ found that the claimant has the severe impairments of degenerative disc disease of the lumbar spine, obesity, anxiety, and depressive disorder. The ALJ found the claimant's hypertension and attention deficit disorder non-severe because no doctor has indicated that her hypertension causes any standing, walking, sitting, bending, or stooping limitations. She also noted that the recent records from Cullman Urgent Care showed that the claimant's blood pressure was normal at 128/83. Regarding her attention deficit disorder, the ALJ noted Dr. Bentley's examination that showed no significant deficits in attention or concentration. She

found that both impairments showed no more than a minimal limitation on the claimant's ability to perform basic work activities. (R. 27-28).

Next, the ALJ found that the claimant did not have an impairment or combination of impairments that met or medically equaled a Listing. In making this determination, the ALJ took into account the claimant's obesity and found that it did not, in combination with her other impairments, cause a disability. She assessed the claimant's degenerative disc disease under Listing 1.04 for spinal disorders and found that the claimant failed to demonstrate any of the abnormalities required for that Listing. The ALJ also considered the Listings related to mental disorders and found that the claimant did not meet Listing 12.04 or 12.06 because she only had moderate restrictions in her activities of daily living, social functioning, and concentration, persistence, or pace. She noted that the claimant's problems with personal care are caused from her back pain, not anxiety or depression. The claimant can cook for herself daily; can do chores such as sweeping and laundry; can drive a car; can shop for her personal needs and food in small stores; has no problems getting along with family or friends; can count change; and takes care of her mother and son. Because the ALJ found that the claimant has no marked difficulties in any of these areas, the claimant did not meet any of the mental impairment Listings. (R. 28-30, 32).

The ALJ found that after considering all the evidence, the claimant's medically determinable impairments could reasonably be expected to cause her alleged symptoms; however, the ALJ stated that the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible. After recounting the claimant's testimony and the medical evidence in the record, the ALJ acknowledged that the claimant "may have some functional limitations as a result of her back impairment. However, the alleged

17

severity is not supported by any objective medical evidence. There are no recent x-rays or MRIs of the claimant's back." The ALJ also noted the claimant's normal gait; normal motor strength in her extremities; normal sensation in her upper and lower extremities; conservative treatment for back pain; ability to take care of her son and terminally ill mother; and failure to seek treatment from a specialist for her back pain. The ALJ found "no evidence that additional surgery was every recommended" and no objective evidence in the record to show her limitations are as severe as she claimed.

Regarding the claimant's mental impairments, the ALJ noted that she never received any formal psychiatric treatment; never had hallucinations, suicide ideations, or paranoia; and had normal attire, psychomotor skills, communication and memory skills, and no significant deficits in memory during Dr. Bentley's assessment. The ALJ pointed to the claimant's reports of depression and anxiety in 2016, but noted that her treatment "consisted of nothing more than medication prescribed by her primary care physician" and she never "sought treatment [with] a psychologist, psychiatrist, or any other licensed mental health professional." She also acknowledged that the claimant may have "some functional limitations secondary to depression and anxiety," but found no objective medical evidence to show those impairments were severe enough to be disabling; the claimant's mental impairment symptoms never "warranted ER treatment or psychiatric hospitalization." (R. 32-33).

The ALJ agreed with the opinion of non-examining consultant Dr. Williams that the claimant had moderate limitations in activities of daily living, social functioning, and concentration, persistence, and pace. However, the ALJ gave no weight to Dr. Williams' opinion that the claimant would miss one to two days of work because of her mental

18

impairments. The ALJ said that opinion was "not consistent with the record and objective findings." The ALJ did not articulate the inconsistency. (R. 33).

The ALJ assigned "no weight" to the opinion of consulting, examining physician Dr. Bentley because "the opinion is not consistent with his own examination findings, nor is it consistent with the overall objective findings by any other medical provider located in the file." The ALJ also gave consulting, examining physician Dr. Hutto "little weight" because "his assessment was also not consistent with his own examination findings or any other objective evidence or record." The ALJ did not specifically explain the inconsistencies for either Dr. Bentley or Dr. Hutto. (R. 33).

The ALJ gave "no weight" to Dr. Beeler's opinion that the claimant was not physically or emotionally able to hold gainful employment because it was a conclusion reserved for the ALJ, and because Dr. Beeler's statement "was not accompanied by any objective findings or facts." She also noted that Dr. Beeler submitted that statement at the claimant's insistence. The ALJ found that Dr. Beeler's opinions "were more subjective" and not based on treatment records. The ALJ assessed "no weight" to NP Cost's December 2015 opinion letter about the claimant's medical history and limitations because she is a "nurse" and is not an acceptable medical source. The ALJ also considered NP Cost's opinion not impartial because she was claimant's co-worker and did not base her opinion on "objective medical evidence." (R. 34).

The ALJ considered the claimant's mother's "Function Report," but gave it "little weight" because the claimant's mother is "not a medical expert" and her opinion "cannot be viewed as entirely impartial." (R. 34).

After considering the entire record, the ALJ determined that the claimant has the residual functional capacity to perform light work, except that she can occasionally balance, stoop, kneel, crouch, and crawl; can occasionally climb ramps and stairs; can never climb ropes, ladders, or scaffolds; must have a sit and stand option during the workday for one to two minutes every hour; should avoid temperature extremes and unprotected heights; can understand, remember, and carry out simple instructions and tasks; is limited to simple routine, repetitive tasks not performed in a fast paced production environment; must have infrequent and well-explained work place changes; needs infrequent, non-intensive interaction with the general public; and can concentrate and remain on task for two hours at a time sufficient to complete an eight-hour workday. (R. 30). Based on the claimant's age, education, work experience, residual functional capacity, and the vocational expert's testimony, the ALJ determined that the claimant could not perform her past relevant work. However, she found that other work exists in significant numbers in the national economy that the claimant could perform, including light work as an inspector, a packager, and a hand bonder. Therefore, the ALJ determined that the claimant was not disabled under the Social Security Act. (R. 37-38).

*Additional Evidence Submitted to Appeals Council*

After the ALJ rendered her decision on February 10, 2016, the claimant submitted additional evidence to the Appeals Council to support her claim for disability.[4] Some of the evidence was dated before the ALJ decision and other evidence was dated after.

---

[4] The claimant concedes that the following records are not new because exact copies of those records were in the record before the ALJ: August 6, 2014 and November 23, 2015 records from Cullman Heart & Urgent Care; February 24 through March 25, 2015 records from Dr. Beeler; November 20, 2015 letter from NP Cost; and April 10, 2007 records from Cullman Regional Medical Center. (Doc. 13 at 4). Therefore, the court will not discuss these records in the context of new evidence submitted to the Appeals Council.

The claimant submitted records from cardiologist Dr. Silvio Papapietro dated July 18-25, 2012, regarding surgical clearance for the claimant's hysterectomy. Because the claimant has a positive diagnosis for Factor V Leiden and Metabolic Syndrome, Dr. Papapietro ordered an echocardiogram, EKG, and blood tests to determine if he could clear the claimant for the surgery. Dr. Papapietro found a small risk of complication but cleared the claimant for the hysterectomy surgery. (R. 464-71).

The claimant also submitted records from Dr. Brian Corliss dating from May 21, 2012 through February 9, 2015. The claimant complained of back pain on May 21, 2012. On February 7, 2013, she complained of menopausal symptoms, and Dr. Corliss documented that the claimant was unable to take hormone replacement therapy because of her high risk for blood clots. At this visit, her blood pressure was 142/92, and she had normal range of motion; normal strength; and a normal gait. On April 24, May 29, November 7, 2013 and April 1, 2014, the claimant received either a Tordadol or Rocephin injection for pain. Her blood pressure was 128/80 on November 7, 2013. (R. 474-93).

Dr. Corliss's records for the claimant and records from Borden Family Pharmacy from January 2012 through December 2015 show that Dr. Corliss prescribed the claimant Percocet in 2012; Robaxin as a muscle relaxant and Lomotil for her IBS diarrhea in 2013; and Zoloft, Wellbutrin, Prozac, and Xanax for her anxiety and depression in 2014. (R. 475-85, 506-19).

The claimant sought to establish treatment with psychiatrist Farah Khan on February 9, 2016, the day before the ALJ rendered her decision. The claimant complained of depression, anhedonia or the inability to feel pleasure, insomnia, and forgetfulness. She reported that

physicians have treated her anxiety and depression with Focalin, Vyvanse, Prozac, Ritalin, Effexor, Cymbalta, and Zoloft. (R. 525).

She told Dr. Kahn that when she was working and made a lot of money she would spend extravagantly. When her son was struggling with his anxiety and "was on the floor rocking back and forth asking for things to get better, I did go out and buy a $65,000 car." Dr. Kahn's found that the claimant was dressed appropriately, calm, and euthymic. She had good insight and judgment. In his "Review of Systems," he noted the claimant's blood pressure was "erratic"; she had headaches; and she suffered from chronic pain. (R. 525-27).

Dr. Khan assessed the claimant as "suffering from a depressive episode and also what might be an underlying personality disorder." Dr. Kahn believed that the claimant's impulse control was because of a possible personality disorder and not attention deficit disorder. He "educated" the claimant about "maladaptive personality" that would cause her to use maladaptive behaviors to try to reduce her anxiety. He prescribed Geodon, which is an antipsychotic medication used to treat schizophrenia and bipolar disorder, and set a follow-up visit in one month. (R. 526).

The claimant sought treatment at the Urgent Care Center in Cullman on February 15, 2016, complaining of worsening back pain. The claimant denied the use of narcotics for her pain, but the medical notes indicate that the prescription data base revealed a prescription for Percocet. The doctor wrote "will not RX narcotics now or in the future," and told her to follow up with Dr. Beeler. (R. 523-24).

The claimant returned to Dr. Beeler on February 18, 2016 complaining of worsening back pain. Dr. Beeler noted that palpation over her upper lumbar spine was "uncomfortable" for

the claimant; she wanted to stand because sitting hurt; and she was crying during most of the visit. Her blood pressure was 174/110. Dr. Beeler gave her a Demerol and Phenergan injection in the office and re-filled her Percocet prescription for three months. He ordered an MRI of her back, that showed degenerative endplate changes; high signal tool in the L3 and L4 vertebral bodies consistent with hemangiomas; mild right-sided disc bulge at L1-2 with mild facet and ligament hypertrophy; mild to moderate diffuse disc bulge at L2-3 and L3-4 with mild to moderate facet and ligament hypertrophy; moderate right foraminal narrowing at L3-4; mild to moderate diffuse disc bulge that mildly flattens the ventral aspect of the thecal sac; moderate facet and ligament hypertrophy and moderate bilateral foraminal narrowing at L4-5; and minimal disc degeneration at L5-S1 with minimal peripheral enhancement in the spinal canal consistent with scarring from the previous surgery. Dr. Demetrius Morros, who read the MRI, opined that the claimant had degenerative disc disease with disc bulges with no herniation or central stenosis. (R. 683-84).

Dr. Beeler's CRNP Ashley Taylor called the claimant on February 23, 2016 with the MRI results. Dr. Beeler wanted to refer her to a spine specialist for surgery. However, because of her Factor V and family history of deep vein thrombosis, the claimant denied the specialist referral for surgery. (R. 684).

The claimant presented to Cullman Regional Medical Center on March 6, 2016, with severe abdominal pain, and Dr. Deborah Campbell admitted her into the hospital. Her blood pressure registered at 171/111, 168/100, and 134/87 while in the hospital. The medical notes indicate the claimant was "extremely anxious and depressed," and had just started taking the Geodon. A CT of her abdomen and pelvis without contrast showed constipation but no acute

findings.  Dr. Campbell's diagnoses included abdominal pain, constipation, depression, and anxiety.  Upon discharge on March 7, Dr. Campbell advised the claimant to follow up with Dr. Kahn regarding the claimant's anxiety and her primary care physician as needed.  (R. 540-54).

On March 14, 2016, Dr. Corliss wrote a letter "To Whom It May Concern" indicating that the claimant was his patient from May 2011 through February 2015.  Her verified that, during that time period, he treated the claimant for hypertension that was "difficult to control"; anxiety and depression that were "difficult to control"; recurring heart palpitations and chest pains; migraine headaches; lower back pain; and "impaired fasting glucose."  He indicated that the claimant was a carrier of Factor V Leiden Mutation, and that she had a "complex medical and psychological history."  (R. 680).

NP Cost wrote a letter on April 24, 2016 addressed "To Whom It May Concern."  In that letter, NP Cost indicated she knew and "cared for" the claimant for the past sixteen years.  Her letter espoused the same information contained in NP Cost's December 20, 2015 letter.  (R. 689).

On August 1, 2016, the Appeals Council stated that it considered the new evidence presented to it, but found that "this information does not provide a basis for changing the [ALJ]'s decision."  (R. 2).

## VI. DISCUSSION

The claimant argues that the Appeals Council committed reversible error by not properly evaluating the claimant's additional medical evidence submitted after the ALJ's decision. The court agrees and finds that the Appeals Council committed reversible error in failing to review the ALJ's decision in light of the claimant's new, chronologically relevant, and material evidence.

The Appeals council did not dispute that the new evidence discussed above was new or chronologically relevant. The court finds that all of those records show that the claimant continued to suffer from the same medical impairments and chronic pain she had complained of for many years and relate back to her condition prior to the ALJ's decision. Those records do not indicate that her condition worsened but reveal that her symptoms continued after the ALJ's decision.

The only reason the Appeals Council gave for its failure to review the ALJ's decision was that the information in those records "does not provide a basis for changing the Administrative Law Judge's decision." The court finds that the medical records regarding the claimant's February 2016 MRI results and Dr. Beeler's referral to a specialist for surgery were material because those records create a reasonable possibility that the ALJ may have changed his decision if he had those records before him at the time of his decision. The ALJ specifically discredited the claimant's subjective allegations regarding the severity and limiting effects of her back pain because the record contained no recent MRI of her lumbar spine and no objective evidence supported the claimant's allegations of the severity of her back pain. The February 2016 MRI provides that missing objective evidence link and supports the claimant's allegations regarding the severity of her back pain.

The February 2016 MRI with contrast of her lumbar spine showed mild to moderate disc bulges L2-3 and L3-4; moderate facet and ligament hypertrophy; moderate bilateral foraminal narrowing at L4-5, and moderate right foraminal narrowing at L3-4. Those findings indicate objective medical evidence that could support the severity of the claimant's back pain. The ALJ also discredited the severity of the claimant's back pain because no doctor had referred her to a

specialist or suggested surgery. The ALJ may have decided differently had he had Dr. Beeler's February 2016 records. A reasonable possibility exists that those 2016 MRI records and Beeler's surgical referral may have altered the ALJ's findings regarding the severity of the claimant's back pain, or at least, altered the hypothetical he posed to the vocational expert.

The court also finds that the psychiatric records from Dr. Kahn and hospital records from Cullman Regional Medical Center are material. The ALJ partly based his findings regarding the severity of the claimant's mental impairments on the fact that the claimant had never sought mental health treatment from a psychiatrist and her symptoms never warranted hospitalization. Dr. Kahn's records give insight into the claimant's depressive disorder and claims of attention deficit disorder and show that the claimant established treatment with a mental health specialist. The records shows that the claimant suffered for years from anxiety and depression and took several medications for those mental impairments. Dr. Kahn's insight and opinion about her diagnosis and prescription of an antipsychotic medication for her symptoms may have changed the ALJ's findings regarding the severity of her mental impairments. Moreover, although her hospitalization in March 2016 stemmed from initial abdominal pain, Dr. Campbell indicated that the claimant's anxiety and depression were primary diagnoses for her hospitalization. Those records create a reasonable possibility that the ALJ may have changed his decision about the severity of the claimant's mental impairments.

The court finds that the Appeals Council failed to adequately consider this new, material, and chronologically relevant medical evidence submitted to it after the ALJ's decision. The court finds that these records undermine the substantial evidence supporting the ALJ's decision and warrant a reversal and remand under sentence four.

Other Concerns

The court is concerned about the ALJ's failure to articulate specific reasons for rejecting and giving no weight to the opinions of consultative examiners Dr. Hutto and Dr. Bentley. The ALJ said their opinions were *inconsistent* with their own findings, but failed to give any explanation as to the inconsistencies to which the ALJ referred. The court questions whether any inconsistencies exist that would warrant outright rejection of their opinions. Likewise, the ALJ failed to articulate specific reasons why he found Dr. Williams' opinion that the claimant would miss one to two days of work per month because of her mental impairments inconsistent. Ignoring a doctor's opinion as inconsistent with no explanation is insufficient. On remand, the ALJ should articulate *specific* reasons for rejecting those opinions as inconsistent.

The court is also concerned about the ALJ's disregard of NP Cost's opinions regarding her treatment of the claimant for many years and knowledge of the extent of her physical and mental impairments. The ALJ simply disregarded NP Cost's opinion because she is a "nurse" and not an acceptable medical source and because she previously worked with the claimant. The ALJ incorrectly referred to NP Cost as a "nurse"—she is actually a nurse practitioner who can prescribe medication. [5] Moreover, neither of those reasons gives the ALJ the freedom to simply disregard everything NP Cross said about the claimant's medical history and limitations. The ALJ failed to consider NP Cost's opinion as evidence of "other sources" that can give insight into the severity of the claimant's impairments and how they affect her ability to work. *See* 20

---

[5] The court notes that for claims filed after March 27, 2017, a nurse practitioner is an "acceptable medical source." *See* 20 C.F.R. § 416.902(a)(7) (listing as an "Acceptable medical source" a "Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with other title, for impairments within his or her licensed scope of practice").

C.F.R. § 404.1513(d).  On remand, the ALJ should carefully evaluate NP Cross's statements and their consistency with the other evidence of record from acceptable medical sources.

VII. CONCLUSION

For the reasons stated above, this court concludes that the decision of the Commissioner is due to be REVERSED and REMANDED.

The court will enter a separate Order in accordance with the Memorandum Opinion.

DONE and ORDERED this 20th day of March, 2018.

**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE